Joan Leona **WRIGHT**, Appellant,

v.

The **CROWN CO., Inc.**, a corporation, Appellee.

No. 4990.

District of Columbia Court of Appeals.

Argued March 2, 1970.

Decided June 30, 1970.

———◆———

Maribeth Halloran, Washington, D. C., with whom R. Michael Frank, Washington, D. C., was on the brief, for appellant.

Bernard D. Lipton, Washington, D. C., for appellee.

Before HOOD, Chief Judge, and KELLY and FICKLING, Associate Judges.

KELLY, Associate Judge:

Appellant responded to The Crown Company's complaint for the $42.80 balance due on the purchase price of certain merchandise by counterclaiming for damages for invasion of privacy, intentional infliction of mental and physical suffering, and for a violation of the District of Columbia blackmail statute [1]—all alleged to have resulted from a number of telephone calls made by Crown's employee in an attempt to collect the debt. Although appellant Wright received a $125 jury verdict on the counterclaim, she appeals, contending that the counterclaim was submitted to the jury on improper instructions. We affirm.

At trial, appellant, a twenty-six year old mother of three, admitted that the only payment made on the purchase price was a ten-dollar down payment made at the time of purchase in December, 1967. The total number of telephone calls by Crown's employee, which appellant began receiving in April of 1968 and which ended the following September, was never determined. The frequency of the calls was described by appellant as "once a week; once every two weeks" and "there were so many calls over and over that I really can't say just when the time were, but they just went on and on and on, him saying the same thing; hanging the phone up on me when he get good and ready, and curse at me." None of the telephone calls occurred after five or six o'clock in the evening.

1. D.C.Code 1967, § 22–2305. *Blackmail.* Whoever verbally or in writing accuses or threatens to accuse any person of a crime or of any conduct which, if true, would tend to disgrace such other person, or in any way subject him to the ridicule or contempt of society or threatens to expose or publish any of his infirmities or failings, with intent to extort from such other person anything of value or any pecuniary advantage whatever, or to compel the person accused or threatened to do or to refrain from doing any act, and whoever with such intent publishes any such accusation against any other person shall be imprisoned for not more than five years or be fined not more than one thousand dollars, or both.

During the third telephone call, when appellant sought to justify her delinquency by explaining that she was searching for a job, the caller "asked me to give him the name of some prospects that I had, and I told him I didn't think that would be necessary, because I didn't know where I would be getting a job—at the places, or not." The caller, according to appellant, replied: "You think your ass is smart, but you know we have ways of getting our money anyway." In the course of the fourth telephone call, Crown's employee stated: "You have here that you was in a training,[2] and now you're drawing unemployment. You know we could get you in serious trouble by that, because you're not supposed to be drawing unemployment, because you just got out of training. * * * And who in the hell do you think you are anyway that you don't have to pay this bill?" In September, 1968, appellant received the last telephone call from Crown's collector: "I asked him please not to call me any more; that I would pay the bill off in full, as soon as I get the first pay. And he said, who in the hell did I think I were to tell him not to call me. He would call me every hour on the hour until I pay him."

Appellant related that by the summer her April weight of 166 pounds had fallen twenty-six pounds and that she visited a doctor "because it got so I couldn't sleep and I couldn't eat, and I was very nervous, and I was losing weight". Although no physician testified, appellant's sister corroborated appellant's nervousness and weight loss. Appellant described her sleeplessness as: "[A]fter he started using profanity over the phone, I got so I couldn't sleep at all. Every time I tried to go to sleep, I feel as if the phone is ringing * *

I would feel that I was dreaming about it would be him when I answered the phone." [3]

Appellant testified that the caller always identified himself as "Mr. Robinson, from the Crown Company." In an answer to appellant's interrogatory, Crown's president admitted that a Crown employee, Elwood Robinson, "has had conversations" with appellant and that he was still employed by Crown. Crown presented no evidence on the counterclaim.

The trial judge directed a verdict in favor of Crown on the uncontested $42.80 debt and instructed the jury to find for appellant on the counterclaim if they arrived at either one of two conclusions: (1) that appellant suffered physical illness as a result of a violation of the blackmail statute,[4] or (2) that Crown's employee either intentionally caused appellant to suffer physical illness or that his conduct was such that a reasonable man would have been substantially certain that physical illness would result. Appellant attacks both instructions as erroneously requiring an injured party to prove physical injury before recovering for mental and emotional injuries.

However, absent a showing of prejudice, a verdict winner cannot be heard to challenge the jury instructions producing the verdict. Appellant cannot complain that her damages were influenced by the allegedly defective instructions because the jury was also instructed that if it should find for appellant on either of the two cause of action instructions then it was required to completely compensate appellant for all "mental anguish and anxiety which resulted in physical illness."

---

2. Appellant testified that she completed a nine-month job training program in April, 1968.

3. Apparently the jury did not accept Crown's thesis that appellant's nervousness, sleeplessness and weight loss could be attributed to her precarious financial situation. Appellant, who was separated from her husband and without any outside

income, testified that after her $62 a week job training allowance ended in April, 1968, she spent three weeks without any income until she became eligible for the $30 a week unemployment compensation which she then collected until she began working in November.

4. See note 1 supra.

Nor can appellant claim prejudice as a result of her inability to determine whether the jury found a failure of proof under one of the challenged instructions. Because appellant made no effort at trial to attribute specific injuries to a specific cause of action, we can assume that there was only one injury, for which there can be only one recovery, and thus it would make no difference whether the verdict, and therefore the recovery, was based on either one or both of the instructions.[5] Appellant has failed to demonstrate how she was prejudiced by the challenged instructions and therefore we need not review them.[6]

Appellant's remaining assignment of error concerns the trial judge's refusal to submit to the jury the issue of punitive damages. "It is a well-established rule in this jurisdiction that a principal may be held liable for exemplary damages based upon the wrongful act of his agent only where he participated in the doing of such wrongful act or had previously authorized or subsequently ratified it with *full knowledge of the facts*."[7] Appellant contends that Crown's authorization, participation and/or ratification of its employee's conduct can be found in the fact that the telephone calls were made during business hours, the fact that the employee was retained in Crown's employ, and in appellant's testimony that after receiving what was to be the last call: "I called back and asked for the manager, and someone answered the phone, giving me no name * * I asked him could he stop Mr. Robinson from calling me. He said the reason they call is to make sure they get their money, and to keep from taking me to court. So, I told him that I had gotten pretty nervous

and I would rather for him to take me to court to stop the phone calls." There were no more telephone calls and shortly thereafter appellant received notice of this suit.

 We agree with the trial court's ruling that there was insufficient evidence of authorization, participation or ratification to present the issue of punitive damages to the jury. Appellant failed to show that appellee was ever aware of its employee's offending conduct before the filing of the counterclaim. The mere fact that it had knowledge or even encouraged its employees to contact its debtors does not make appellee liable for punitive damages.

There being no showing of error justifying reversal, the judgment of the trial court is

Affirmed.

---

5. For the same reason it makes no difference that the jury received no instructions concerning appellant's right to privacy.

6. We do not here hold that a plaintiff injured by an intentional tort must, in all cases, demonstrate physical injury to recover damages for mental and emotional suffering. *See* Clark v. Associated Retail Credit Men, 70 App.D.C. 183, 105 F.2d 62 (1939). Since appellee has filed no

cross-appeal we need not discuss the application of the blackmail statute to the conduct of an over-zealous debt collector. *Compare* Slater v. Taylor, 31 App.D.C. 100 (1908) *with* Clark v. Associated Retail Credit Men, 70 App.D.C. 183, 188, 105 F.2d 62, 67 (1939).

7. Safeway Stores v. Gibson, D.C.Mun.App., 118 A.2d 386, 388 (1955) (emphasis added) (footnote omitted).